NOT FOR PUBLICATION                                            (Doc. Nos. 77, 81, 82, 95)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

|  |  |
|---|---|
| HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, : : : Plaintiff, : : v. : : TRANSITIONS RECOVERY PROGRAM, : : : Defendant. : | Civil No. 10-3197 (RBK/KMW)  **OPINION** |

**KUGLER**, United States District Judge:

This matter comes before the Court on Defendant Transitions Recovery Program's motion to strike certain exhibits that Plaintiff Horizon Blue Cross Blue Shield of New Jersey submitted in support of its motion for summary judgment.  (Doc. No. 95.)  For the reasons stated herein, Defendant's motion will be **GRANTED**.

**I.    BACKGROUND[1]**

Plaintiff is a not-for-profit health service corporation that provides health coverage and benefits for its subscribers in New Jersey.  Plaintiff authorizes the payment of subscribers' claims subject to the conditions, limitations, and exclusions contained in its health benefits plans.  Defendant is a drug and alcohol treatment center located in Florida, which provided treatment to

---

[1] Because the facts underlying this case are established in detail in the Opinion accompanying this Court's June 10, 2011, Opinion denying Defendant's motion to dismiss, and its January 24, 2012 Opinion denying Defendant's motion for reconsideration, the Court recites only the facts relevant to the instant motion.  See Horizon Blue Cross Blue Shield of New Jersey v. Transitions Recovery Program, No. 10-3197, 2011 WL 2413173 (D.N.J. June 10, 2011); Horizon Blue Cross Blue Shield of New Jersey v. Transitions Recovery Program, No. 10-3197, 2012 WL 243349 (D.N.J. Jan. 24, 2012).

subscribers of Plaintiff's health benefit plans, and submitted claims to Plaintiff for payment of that treatment.  Plaintiff alleges that, between January 2002 and March 2008, Defendant submitted 8,652 claims to Plaintiff that contained diagnoses of alcohol dependency—a diagnosis whose treatment receives broader coverage from Plaintiff's plans than is afforded to treatment of other substance abuse dependencies and behavioral disorders.  Plaintiff alleges that it conducted an audit of Defendant's records and concluded that Defendant misrepresented non-alcohol-related diagnoses as alcohol dependencies in order to receive Horizon's broader coverage.

On or about October 20, 2011, Defendant served its First Request for the Production of Documents on Horizon.  Plaintiff responded to these requests in June 2012, but the entirety of the production was returned to counsel when it became apparent that the documents produced contained privileged information.  (Def.'s Br. 3 & n.2.)  Plaintiff again produced documents in response to Defendant's request on August 28, 2012.  Plaintiff's production included a Statement of Claims—which included 88,197 claim lines for hundreds of patients—and benefits plans for seventy-four (74) patients.  (Def.'s Br. 2; Pl.'s Opp'n Br. 5-6.)  The plans produced on this date included plans for Patients V.F., S.K., and C.E.  (Id.)  Remaining plan data was produced in a companion matter, see PCA, et al. v. Blue Cross Blue Shield Assoc., et al., 1:09 cv-05619 (N.D. Ill.) ("the Pennsylvania Chiropractic Association litigation"), and then provided to Defendant pursuant to an informal agreement.[2]  (Pl.'s Opp'n Br. 6.)  Relevant plans that were produced in the companion matter included plans for Patients M.P., S.N., T.G., and H.H.  (Id. at 6.)

---

[2] After Plaintiff filed its complaint in this matter, Defendant joined a pending class action against Plaintiff and others in the Northern District of Illinois, Eastern Division. See PCA, et al. v. Blue Cross Blue Shield Assoc., et al., 1:09 cv-05619 ("the Pennsylvania Chiropractic Association litigation").  "Counsel for [Defendant] in this matter was also counsel for plaintiffs in the Pennsylvania Chiropractic Association litigation.  Importantly, [Plaintiff] and the plaintiffs in the Pennsylvania Chiropractic Association litigation came to an agreement wherein 'Horizon and the plaintiffs agree that they may use all discovery obtained from the Horizon New Jersey litigation in the Pennsylvania Chiropractic Association litigation and vice-versa,' which was memorialized in an email between the parties' counsel on February 14, 2013."  (Doc. No. 91.)

According to Plaintiff, plan data for Patients B.C. and K.A. were matters of public record and thus available on the State's website.  (Id.)  On April 22, 2013, in response to Defendant's request, Plaintiff emailed plans for Patients C.H. and H.H.  (Id. at 6-7.)  Finally, on May 23, 2013, Plaintiff mailed to Defendant plans for Patients B.C., M.P., S.N., and K.A.  (Id. at 7.)

Although discovery was slated to conclude by January 31, 2013, as per an Amended Scheduling Order issued by Magistrate Judge Williams, (Doc. No. 61), the parties continued to exchange documents after this date.  Indeed, Judge Williams ordered Defendant to produce certain outstanding medical records by February 23, 2013.  (Doc. No. 62.)  From what this Court has been able to gather, discovery was fraught with numerous disputes and frequent finger-pointing as to who was failing to meet its discovery obligations.  However, the parties successfully completed discovery and subsequently filed dispositive motions in accordance with Judge Williams' Amended Scheduling Order dated March 26, 2013.  (Doc. No. 66.)

On July 26, 2013, Plaintiff filed a Motion for Partial Summary Judgment, along with a Certification prepared by Christine S. Orlando, the attorney "principally responsible for the representation of Plaintiff Horizon Blue Cross Blue Shield of New Jersey."  (Certification of Christine S. Orlando ("Orlando Certification") ¶ 1).  Attached to Ms. Orlando's Certification were a number of exhibits.  (See generally Doc. No. 77.)  In its motion for partial summary judgment, Plaintiff argues that it is entitled to summary judgment:

> on those claims where [Defendant] admits that it misrepresented the diagnosis contained on the health insurance claim form and received payments beyond the benefit limits contained in the subscriber's benefit plan . . . . [Specifically, Plaintiff] is entitled to summary judgment on those claims in which [Defendant] reported a diagnosis of alcohol dependency which contradicts the diagnosis contained in its own treatment records and made by its treating physicians.

(Pl.'s Mot. for Summ. J. 2.)

3

As stated above, Ms. Orlando submitted a number of exhibits to her Certification that set forth specific patient information and data. Defendant moves to strike Exhibits R, T, X, BB, EE, II, LL, PP, SS, and VV (the "Challenged Exhibits"), which purport to set forth the health insurance claims submitted by Defendant to Plaintiff for Patients B.C., C.H., V.F., T.G., M.P., S.K., C.E., S.N., H.H., and K.A. Each of the Challenged Exhibits includes a spreadsheet that sets forth the following columns: (1) DIAGNOSIS; (2) DIAGNOSIS DESCRIPTION; (3) GROUP NAME; (4) PATIENT_LAST_NAME; (5) PATIENT_FIRST_NAME; (6) FIRST_DATE_OF_SERVICE; (7) CHARGES; (8) AMOUNT_PAID; (9) DEDUCTIBLE; (10) COPAY; (11) COINSURANCE. For each "date of service" there is a corresponding monetary amount entered for columns seven (7) through eleven (11). Illustratively, for Challenged Exhibit T, on July 20, 2009, a charge of $550.00, an amount paid of $330.00, a deductible of $0.00, a copay of $0.00, and a coinsurance amount of $220.00 were entered. (Orlando Certification, Ex. T.) Finally, at the top right-hand corner of each of the Challenged Exhibits, Plaintiff provides a "damages" amount.[3] (See Orlando Certification, Exs. R, T, X, BB, EE, II, LL, PP, SS, VV.)

On September 10, 2013, Defendant filed a letter advising Judge Williams that it had identified problems with Plaintiff's summary judgment motion, e.g., "documents attached as exhibits to Ms. Orlando's certification were not Bates stamped or identified in any way other than with an exhibit letter," and "several exhibits were identified for which [Defendant] sought evidence of the timing and method of prior production, as [it] w[as] unable to locate same in [Plaintiff's] prior productions." (Doc. No. 90.) Plaintiff responded that Defendant had all the

---

[3] For patient B.C. (Challenged Exhibit R), Plaintiff provides the same spreadsheet without a "damages" amount and includes what appears to be an intake assessment performed by Defendant as well as a comprehensive treatment plan. (Orlando Certification, Ex. R.)

4

information contained in the Challenged Exhibits at its disposal as all of this information was previously produced, albeit in different forms. (Doc. No. 91.)

In an Amended Scheduling Order dated September 24, 2013, Judge Williams granted Defendant leave to file a motion to strike the Challenged Exhibits. (Doc. No. 94.) On October 4, 2013, Defendant filed its brief, arguing that the Challenged Exhibits were not previously produced, but instead are "'compilations' or 'derivations' of other information, some of which was similarly untimely produced." (Def.'s Br. 1, Doc. No. 95.) Plaintiff filed its opposition on October 11, 2013. As this motion is fully briefed, the Court turns to the parties' arguments.

## II. LEGAL STANDARD

Rule 26(a) requires voluntary disclosure by the parties of "a computation of each category of damages claimed by the disclosing party." Fed. R. Civ. P. 26(a)(1)(A)(iii). Parties are obligated under Rule 26(e) to supplement any disclosures they have made:

> [a] party who has made a disclosure under 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court.

Fed. R. Civ. P. 26(e). If a party fails to comply with Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

In deciding whether to impose sanctions against a defendant under Rule 37(c)(1), the Court considers four factors: (1) prejudice or surprise to the plaintiff; (2) the ability of the plaintiff to cure the prejudice; (3) the likelihood of disruption; and (4) the defendant's bad faith or unwillingness to comply. See Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir. 1995). In addition to preventing the non-compliant party from using the challenged information

5

or witness to supply evidence on a motion, the Court may also "order payment of the reasonable expenses, including attorney's fees, caused by the failure; . . . inform the jury of the party's failure; and . . . impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)." Fed. R. Civ. P. 37(c).

Rule 37 is "written in mandatory terms and is designed to provide a strong inducement for disclosure of Rule 26(a) material." Newman, 60 F.3d at 156 (internal citation marks and quotation omitted). However, district courts must "exercise particular restraint in considering motions to exclude evidence." ABB Air Preheater v. Regenerative Envtl. Equip. Co., 167 F.R.D. 668, 671 (D.N.J. 1996) (citations omitted); see also id. (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 791-92 (3d Cir. 1994) (stating that "[t]he Third Circuit has, on several occasions, manifested a distinct aversion to the exclusion of important testimony absent evidence of extreme neglect or bad faith on the part of the proponent of the testimony").

## III.  DISCUSSION

Here, Defendant argues that because Plaintiff "produced certain exhibits containing a calculation of damages for the first time in conjunction with its motion for summary judgment, [it] was deprived of a meaningful opportunity to examine and challenge these documents during the course of discovery."  (Def.'s Br. 1.)  Plaintiff sets forth several arguments in support of the Challenged Exhibits.

First, Plaintiff states that the underlying claims data and benefits plans for the patients identified were produced during discovery and that Defendant never objected to the production of the plan and claims data at issue.  (Pl.'s Opp'n Br. 7.)  Plaintiff notes that the Challenged Exhibits simply set forth the terms of the benefits plans along with data from the Statement of Claims in a single document, that they "contain each and every claim submitted by [Defendant]

6

and paid by [Plaintiff] for the patients subject to [Plaintiff's] motion for summary judgment," and that they do not include any additional information that was not included in the original Statement of Claims.[4]  (Id.)

Second, Plaintiff states that when it filed its Amended Complaint it included a chart listing thirty-three (33) patients who were subject to Plaintiff's pre-litigation audit.  (Id.) According to Plaintiff, this chart "undisputedly indicates that [Plaintiff's] damages are calculated by computing the overpayment made to [Defendant] using the amount paid to [Defendant] and the maximum benefit payment allowed under the plan."  (Id.)  Thus, because Defendant had this chart in its possession as of the date Plaintiff filed its Amended Complaint, it was aware of the manner in which Plaintiff calculated its damages as far back as September 7, 2011.

Third, Plaintiff points to documents produced during discovery related to its pre-litigation audit that it says illustrated its calculation of damages.  For example, Plaintiff produced the Investigative Summary of Jim Howell, a Lead Investigator with Plaintiff who was entrusted with the investigation and handling of this matter.  (Id. at 9.)  Mr. Howell's Investigative Summary contained an exhibit entitled "Transitions Recovery Program Audit Findings and Benefit Calculations" (the "Howell Findings and Calculations"), which is a spreadsheet, similar to the chart set forth in the Amended Complaint, that identifies a number of patients whose treatment records were the subject of Plaintiff's audit.  (Id.; see also Pl.'s Opp'n Br., Ex. I.)  In the Howell Findings and Calculations, Plaintiff identifies, among other things, "the patient's name, the plan pursuant to which the patient received benefits from [Plaintiff], the diagnosis contained in the treatment records, the diagnosis represented on the health insurance claim forms submitted to [Plaintiff], the benefits policy provision, and the overpayment."  (Id.)  According to Plaintiff,

---

[4] Plaintiff eventually hedges, however, and concludes: "at worst, these exhibits constitute excerpts or summaries of documents undisputedly provided," which is permissible under FRE 1006. (Pl.'s Opp'n Br. 16.)

7

"the overpayment is the difference from the claims paid and the correct payment under the benefits policy provision." (Id.) Patients B.C. (Challenged Exhibit R), C.H. (Challenged Exhibit T), S.N. (Challenged Exhibit PP), H.H. (Challenged Exhibit S.S.), and K.A. (Challenged Exhibit VV) are included in the Howell Findings and Calculations. (Id.)

Fourth, Plaintiff states that it identified damages in the amount of $8 million in its Rule 26 Disclosures. (Id. at 11.) Additionally, in response to Defendant's Interrogatory No. 7, which requested that Plaintiff "[d]escribe [its] method of determining and calculating all damages identified in the Complaint," Plaintiff states its response put Defendant on notice as to its claimed damages.[5]

The Court is not persuaded by Plaintiff's arguments.

While Plaintiff argues that Defendant had in its possession the information necessary to calculate Plaintiff's damages, and thus explore these calculations during the deposition phase of discovery, a review of the discovery timeline reveals that this simply was not the case.

The parties concluded depositions in December 2012, however, plan data for Patients M.P. (Challenged Ex. EE), S.N. (Challenged Ex. PP), T.G (Challenged Ex. BB), and H.H. (Challenged Ex. SS), were not actually provided until after February 14, 2013.[6] Further, the plan

---

[5] Plaintiff specifically responded:

> [Plaintiff's] benefit plans contain broader coverage for the treatment of alcohol dependence and [Defendant] submitted claims which misrepresented that [certain patients] suffered from alcohol dependency to procure benefits to which it was not entitled. 'Therefore, based on a pattern of claims submitted, Horizon paid Transitions in excess of eight million dollars ($8,000,000) in claims which were ineligible for payment as a result of the benefit limitations under its benefit plans and policies of insurance.'

(Pl.'s Opp'n Br. 11-12 (emphasis omitted).)

[6] Although this was provided in accordance with the parties' informal agreement to share discovery produced in the Pennsylvania Chiropractic Association litigation, it appears that these plans were produced in that matter in January 2011. Thus, the Court is thus puzzled as to why this information was not produced earlier given that it concerned claims at issue in this case, was clearly within Plaintiff's possession, and capable of production well in advance of December 2012.

for Patient C.H. (Challenged Exhibit T), was not provided to Defendant until April 22, 2013, and not until Defendant specifically requested its production. And the plans for Patients B.C. (Challenged Ex. R), M.P. (Challenged Exhibit EE), S.N. (Challenged Ex. PP), and K.A. (Challenged Ex. VV) were not mailed to Defendant until May 23, 2013.[7] In sum, at the time that Mr. Howell was deposed—December 10, 2012—Defendant was missing key information. Although Plaintiff argues that Defendant should have just asked more questions about how Plaintiff calculated its damages and how Mr. Howell arrived at the numbers presented in the Howell Findings and Calculations, even if it had, there are still discrepancies between the damages amounts set forth in the Howell Findings and Calculations and the amounts set forth in the Challenged Exhibits. That is to say, any line of questioning as to these calculations may have been futile.

In analyzing the Challenged Exhibits, the Court focused on Patient C.H., whose information was set forth in Challenged Exhibit T, Plaintiff's Statement of Undisputed Facts in support of its motion for partial summary judgment, and the Howell Findings and Calculations.

Plaintiff claims that it overpaid Defendant $18,150.00 for Patient C.H.'s treatment. (See Statement of Undisputed Facts ("SUF") ¶¶ 111-13; Orlando Certification, Ex. T.) However, if one takes the total payment to Defendant for Patient C.H. as stated in Plaintiff's Statement of Undisputed Facts—$34,650.00—less the lawful benefits payment according to Patient C.H.'s plan as stated in Challenged Exhibit T—$12,725.00—the claimed overpayment should actually amount to $21,925.00, not $18,150.00. (Id.)

---

[7] Although Plaintiff argues earlier that plans for Patients B.C. and K.A. were matters of public record, it still produced them to Defendant. Further, as stated in note 5 supra, plans for Patients S.N. and M.P. had already been produced in the companion matter, and thus could have been produced earlier than late May 2013.

Further, in trying to reach Plaintiff's claimed damages amount of $18,150.00, based on Plaintiff's alleged method of calculation, the Court found that it was only able to do so after manipulating the numbers in the "AMOUNT_PAID" column in Challenged Exhibit T.

For example, in the "AMOUNT_PAID" column in the spreadsheet, all but two cells are filled with a monetary sum, typically $550.00. When the Court added up the numbers in the "AMOUNT_PAID" column as is, it reached a sum of $29,775.00. After subtracting $12,725.00, the lawful benefits payment listed in the spreadsheet, it reached a sum of $17,050.00. A sum that clearly differs from the $18,150.00 figure set forth in Challenged Exhibit T. Then, the court wondered if the blank spaces in the spreadsheet might have been clerical errors, as opposed to deliberate omissions. Thus, the Court "filled in" these two cells with the same amount in the cells preceding and following them ($550.00) and reached a sum of $30,875.00. It was only then, when the Court again subtracted $12,725.00 (the lawful benefits payment) that it finally reached $18,150.00, i.e., the damages amount set forth in Challenged Exhibit T and Plaintiff's Statement of Undisputed Facts.

The Court also found a discrepancy between the claimed overpayment for Patient C.H. listed in Plaintiff's Statement of Undisputed Facts and Challenged Exhibit T ($18,150.00), and the claimed overpayment for Patient C.H. that was produced to Defendant via the Howell Findings and Calculations, $21,575.00. (SUF ¶ 113; Pl.'s Opp'n Br., Ex. I.) This sum is certainly closer to the $21,925.00 that the Court computed above without manipulating Plaintiff's exhibit; however, there is still a discrepancy.

Although Plaintiff claims that Defendant always had the information necessary to compute Plaintiff's claimed damages, based on the information before the Court, it appears that

10

Defendant would not have been able to figure out the exact amount that Plaintiff now seeks, let alone rely on any number it computed.

Courts ordinarily decline to exclude evidence where there is "sufficient time in which to complete necessary additional discovery." See, e.g., Galentine v. Holland Am. Line-Westours, Inc., 333 F. Supp. 2d 991, 995 (W.D. Wash. 2004) (declining to impose the exclusion sanction where the expert report was untimely, but there was sufficient time in which to complete necessary additional discovery before the scheduled trial date); CCR/AG Showcase Phase I Owner, L.L.C. v. United Artists Theatre Circuit, Inc., No. 208-00984, 2010 WL 1947016, at *8 (D. Nev. May 13, 2010) (holding similarly).[8]  Here, however, the Court believes that striking the exhibits at issue and ordering that the parties engage in further discovery as to the Challenged Exhibits and related damages figures is the best course of action in light of the inconsistencies identified above.

Accordingly, Defendant's motion will be granted and the parties will be given thirty (30) days from the date of the Order accompanying this Opinion to conduct further discovery. Because the substance of the parties' pending motions for summary judgment might change based on newly discovered evidence during this thirty-day period, the Court will deny the parties' motions for summary judgment without prejudice and give them leave to refile once discovery is complete.

---

[8] See also Frontline Med. Associates, Inc. v. Coventry Health Care, 263 F.R.D. 567, 569 (C.D. Cal. 2009) (denying Rule 37(c) sanctions because the discovery period had recently been extended and the disclosure was made sufficiently in advance of the discovery cut-off date).

## IV. CONCLUSION

For the reasons stated above, Defendant's motion will be granted. An appropriate Order will issue today.


Dated: 3/27/2014                           s/ Robert B. Kugler
                                                                           ROBERT B. KUGLER
                                                                           United States District Judge